UNITED STATES DISTRICT COURT
DISTRICT COURT OF MINNESOTA

| | |
|---|---|
| _____ ) <br><br> ) <br> ANA MARIA GELHAYE, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> JOHN DOE 1, in his individual capacity as a Minneapolis ) <br> Police Officer, JOHN DOES 2-6, acting in their individual ) <br> capacities as Minneapolis Police Officers; JOHN DOES 7 ) <br> and 8, acting in their individual and official capacities as ) <br> supervisory Police Officers; MEDARIA ARRADONDO, ) <br> acting in his individual and official capacities as the ) <br> Minneapolis Chief of Police; and the CITY OF ) <br> MINNEAPOLIS, a municipal entity, ) <br> ) <br> ) <br>     Defendants. ) <br> ) <br> _____ ) | COMPLAINT <br> SEEKING MONEY <br> DAMAGES <br><br><br> DEMAND <br> JURY TRIAL |

**GENERAL INTORDUCTION**

1. This is an action under 42 U.S.C. § 1983 seeking money damages as compensation for

   Defendants' violation of Plaintiff's constitutional rights under the First, Fourth, and

   Fourteenth Amendments to the United States Constitution.

2. Plaintiff Ana Maria Gelhaye ("Gelhaye") sustained serious injuries as a result of the

   unreasonable use of deadly force on May 27, 2020, in addition to other violations of her

   constitutional rights, by Defendants John Does 1-6, Minneapolis Police Officers. The

   conduct of the Defendants violated Gelhaye's clearly established federal civil rights, all

while acting under the color of state law. State law claims and, by consequence, limitations and defenses under state law are not applicable to this civil rights lawsuit.

3. Gelhaye also asserts claims against John Does 7-8 (the supervisory defendants) with regard to their roles as trainers, supervisors, and policymakers.

4. Gelhaye further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

5. Gelhaye is, and was at all times material herein, a citizen of the Unites States and a resident of the State of Minnesota.

6. Defendants John Does 1-6, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as officers of the Minneapolis Police Department ("MPD"). They are sued in their individual capacities.

7. Defendants John Does 7 and 8, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as supervisory officers of the Minneapolis Police Department. They are sued in their individual and official capacities.

8. Defendant Medaria Arradondo ("Chief Arradondo") was at all times material herein the Chief of the Minneapolis Police Department and a policymaker for the MPD. He is sued in his individual and official capacities.

9. Defendant City of Minneapolis is a municipality duly incorporated under the laws of the State of Minnesota.

10. Gelhaye brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of the Court over this matter.

11. The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

12. On May 25, 2020, George Floyd was killed by former Minneapolis Police Officer Derek Chauvin while three fellow officers stood by and refused to intervene. Video of the murder sparked worldwide outrage and many protests ensued as a call to change systemic racism in our nation's police departments.

13. In the following days, thousands of Minneapolis residents took to the city's public streets and spaces to protest the unjustifiable killing of Mr. Floyd, as well as police killings of other people of color. As city officials acknowledged, the vast majority of these protestors exercised their First Amendment rights in a forthright, peaceful, and lawful manner.

14. During the daytime in Minneapolis, the vast majority of activity on May 26, 2020, and May 27, 2020, was peaceful and aimed at effecting change. But as was typical for the Minneapolis Police Department's extreme tactics, the protests – peaceful or not – were met with force by the MPD, including the improper use of tear gas, 40 millimeter blunt-impact projectiles, and other supposedly "less lethal" munitions.

15. Plaintiff Gelhaye attended one of the protests in the aftermath of Mr. Floyd's murder in an effort to exercise her constitutional rights to assemble in order to make known and

voice her displeasure with the violence perpetrated by MPD officers against people of color and particularly against African American men. Gelhaye was also assisting other protestors by giving them milk and water.

16.  On May 27, 2020, around 7pm, Gelhaye was live streaming the events from her cell phone to Facebook as she was peacefully protesting on the street outside of the Third Precinct.

17. The City responded by shooting Gelhaye in her right eye, causing a severe and permanent injury to that eye.

18. Gelhaye was taking part in First Amendment-protected activity. She became one of the many victims of the MPD's pattern and practice of excessive force.

19. The events culminating in Gelhaye's shooting were broadcast live on Facebook as depicted in the photographs below. The protestors were peaceful, and many had their hands up. There was a heavy police presence, including officers on the roof of the Third Precinct.

20. Minneapolis police officers shot at the protestors with projectiles and tear gas.













21. No warnings were given before Defendant Doe 1 fired.

22. Gelhaye was struck in the right eye with, upon belief, a 40-millimeter blunt-impact
    projectile, resulting in serious injuries. Gelhaye dropped her phone which continued to
    record and live stream the broadcast on Facebook as depicted in the photographs below.
    (Gelhaye can be seen in the mask, with the eye injury.)





23. Gelhaye had not committed any crime and was never charged with any crime.

24. Gelhaye had not displayed any aggression.

25. Gelhaye was unarmed.

26. Gelhaye posed no threat to the officers or others.

27. The scene was not chaotic besides the police officers shooting projectiles at innocent people.

28. The scene did not contain rioters or looters.

29. No warnings were given to Gelhaye regarding a potential use of force.

30. No directions were given to Gelhaye.

31. No commands were given to Gelhaye.

32. In order to shoot Gelhaye with a blunt-impact projectile from a 40-millimeter launcher, Defendant Doe 1 had to execute a series of volitional acts.

33. Defendant Doe 1 volitionally held the launcher in firing position, requiring his non-firing hand to hold the foregrip of the launcher and placing his firing hand on the pistol grip of the launcher.

34. Defendant Doe 1 volitionally moved the safety lever on the launcher from the "safe" position to the "fire" position.

35. When the safety lever of the launcher is in the "safe" position, a finger cannot be placed on the trigger.

36. When the safety lever of the launcher is in the "safe" position, the trigger is unable to be moved rearward.

37. It is only when the safety lever is in the "fire" position that a finger can be placed on the trigger, making the launcher ready to fire.

38. Defendant Doe 1 volitionally inserted his finger inside the trigger guard.

39. Defendant Doe 1 volitionally aimed the weapon at his intended target – Gelhaye.

40. Defendant Doe 1 volitionally placed his finger on the trigger.

41. Defendant Doe 1 volitionally exerted sufficient trigger-pull pressure to fire the launcher loaded with 40 millimeter "less lethal" rounds at Gelhaye.

42. Defendant Doe 1 volitionally fired at Gelhaye.

43. The impact caused devastating and permanent injuries to Gelhaye.

44. Making matters worse, no MPD officer rendered aid to Gelhaye after she was shot. Instead, several bystanders (who happened to be nurses/medical workers) provided immediate first aid on the street and then at Moon Palace Books, a store in the area, before rushing Gelhaye to Abbott Northwestern Emergency Department.

## UNAUTHORIZED USE OF DEADLY FORCE

45. MPD Policy 5-317 addresses the 40mm launcher that Defendant Doe 1 used to shoot the projectile into Gelhaye's eye.

46. Under Policy 5-317(I), the "MPD recognizes that combative, non-compliant, armed and or otherwise violent subjects cause handling and control problems that requires special training and equipment. The MPD has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations." See also, Policy 5-317(V)(C), noting the launcher "can be used when the incapacitation of a violent or potentially violent subject is desired."

47. Policy 5-317(II) defines a 40mm less-lethal round as a "[d]irect fire round used in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-complaint subject."

48. Under Policy 5-317(III)(D), MPD officers are forbidden from deploying the 40mm launchers for crowd-management purposes.

49. Policy 5-317(III)(B)(1) notes that "[t]he use of the 40mm less-lethal round should be considered a level slightly higher than the use of an impact weapon and less than deadly force when deployed to areas of the subject's body that are considered unlikely to cause death or serious physical injury." Policy 5-317(IV)(B)(1) outlines the acceptable "target areas" as follows:

  • Large muscle groups in the lower extremities (buttocks, thigh, knees);

  • Alternative target areas (ribcage area to waist and larger muscle areas of shoulder).

50. Policy 5-317(IV)(B)(1) notes the following as **areas to avoid**:

  • Head;

  • Neck;

  • Spinal cord;

  • Groin; and

  • Kidneys.

51. Policy 5-317(IV)(B)(2) states that "[o]fficers shall be aware that delivery of the 40mm impact projectiles to certain parts of the human body can cause **grievous injury** that can lead to **permanent physical or mental incapacity or possible death**" (emphasis added).

52. Policy 5-317(IV)(B)(2) states that the "[a]reas susceptible to death or possible severe injury are the **head, neck, throat, and chest**" and that these areas should be avoided "**[u]nless deadly force is justified**" (emphasis added).

53. Policy 5-317(V) requires medical assistance to be rendered in accordance with Policy 5-306. Further, if possible, officers are to take photographs of any injuries to the subject.

54. Policy 3-517(V)(G)(1)-(2) requires officers who deploy 40mm rounds to report the force in accordance with Policy 5-306, which mandates that they complete a report entitled "FORCE" and immediately notify dispatch, which in turn notifies a supervisor.

55. Supervisors are notified because they are required to respond to the scene any time a 40mm round is used. A supervisor must review the incident and complete a use-of-force review. Further, the responding supervisor(s) are to ensure that the spent rounds are collected and property inventoried, if possible. See Policy 5-317(V)(G)(3)-(4).

56. Defendant Doe 1's actions in shooting Gelhaye contravened MPD training regarding the use of the 40mm launcher.

57. Defendant Doe 1's actions in shooting Gelhaye contravened MPD policies regarding the use of the 40mm launcher.

58. None of the permissible uses of the 40mm launcher in Policy 5-317 applied to Gelhaye.

59. Defendant Doe 1 utilized deadly force when no force was authorized, and this was clearly established law as of May 27, 2020, in the United States America.

**THE POST-INCIDENT CONDUCT OF DEFENDANTS DOES 1-6**

60. The events surrounding the shooting of Gelhaye became particularly suspicious when all of the MPD officers at the scene, including Defendants Does 1-6, failed to render aid to a seriously injured person.

61. The involved officers, who did not care about Gelhaye's constitutional rights, showed they had no concern about her as a human being who was acutely injured – a person they had sworn "to protect with courage and serve with compassion." These officers

abandoned their duty to the Constitution, and their humanity in order to conceal their identities and avoid the consequences of even providing aid for what could have been a fatal wound.

62. Similarly, and not surprisingly, none of MPD's policies were followed by Defendants Does 1-6 in the moments after the shooting of Gelhaye.

63. The failure to report, or to accurately report, the use of deadly force by MPD officers occurred repeatedly in the days following George Floyd's death by the Minneapolis Police Department.

64. The central tenet of MPD's Policies and Procedures is to enable the MPD, the involved citizens, and the public to learn:

• What acts each MPD officer took

• What use of force was employed

• What weaponry was used and in what fashion

• If any MPD officer injured any individuals

• If and what aid was rendered by any MPD officer

65. Yet, there has been no such transparency with regard to Gelhaye's incident, in an effort to prevent accountability.

66. Additionally, upon information and belief, Defendants Does 1-6 either failed to follow MPD policies with regard to report writing and supervisor notification or falsified reports, in an attempt to conceal the unauthorized use of deadly force on Gelhaye.

67. For example, Defendant Doe 1's unauthorized use of deadly force caused injury to Gelhaye and therefore, under Policy 5-306, Defendant Doe 1 was required to document the use of force in a CAPRS Report entitled "FORCE" and notify a supervisor.

17

68. Additionally, Defendant Doe 1 was to remain on the scene during said required notification of the supervisor.

69. The "FORCE" CAPRS report was to be "completed as soon as practical, but no later than the end of that shift."

70. Further, Policy 5-306 required supplements describing the use-of-force incident, in detail, to be completed.

71. Similarly, Policy 4-602(A) mandated that "[a] short public narrative statement describing the offense or incident" shall be prepared. Yet even this simple synopsis of events was not completed with regard to the shooting of Gelhaye or others.

72. If the applicable MPD policies outlined above had been followed, the following information would be readily available:

> • A description of the scene and events leading up Defendant Doe 1 pulling the trigger.
>
> • The identity of shooter.
>
> • The identities of witness officers.
>
> • The identities of lay witnesses at the scene.
>
> • The treatment and aid rendered by MPD officers (if any).
>
> • A description of the injuries Gelhaye suffered.
>
> • Identification of the launcher used and projectile deployed by the shooter.

73. But rank-and-file MPD officers have felt free to violate subjects' constitutional rights under department-wide reporting methods to cover up their misconduct.

74. The supervisory Defendants and policymakers at the City of Minneapolis and the Minneapolis Police Department had actual knowledge of the constitutionally infirm

reporting and lack of adherence to MPD policies among officers or were deliberately

indifferent to the need for proper reporting by turning a blind eye.

75.  MPD officers are routinely not disciplined when they fail to truthfully report the

unauthorized use of deadly force, or fail to cooperate with investigations into fellow

officers.

76. The actions of the uncooperative and policy-violating MPD officers, and the failures of

the City and Chief Arradondo to discipline the officers for such conduct, fly in the face of

MPD's Code of Conduct, embolden officers to act without regard for the rights of

citizens, and were a moving force behind the deprivation of Gelhaye's federal civil rights.

77. Some combination of the failure to report, the failure to report truthfully, and the failure

to cooperate in investigations has occurred here.

78. Defendants Does 2-6 actively encouraged Defendant Doe 1's use of excessive force by

colluding with Defendant Doe 1 and one another to eschew report writing and supervisor

notification, or to fail to report truthfully.

79. Defendants Does 1-6 used the absence of report writing and supervisor notification or the

absence of truthful report writing to frustrate Gelhaye's assertion of her civil rights.

80. Defendants Does 1-6 used the absence of report writing and supervisor notification or the

absence of truthful report writing to skirt responsibility and accountability for their

actions and inactions on May 27, 2020.

81. Defendants Does 7-8, the City and Chief Arradondo have acquiesced in said collusion by

failing to require adherence to policies regarding report writing, supervisor notification

and policy-violation notifications.

82. Defendants Does 7-8, the City and Chief Arradondo have acquiesced in further frustration of Gelhaye's civil rights by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

83. Defendants Does 7-8, the City and Chief Arradondo have acquiesced in the unauthorized use of deadly force by Defendant Doe 1 going unpunished by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

84. Defendants Does 7-8, the City and Chief Arradondo have acquiesced in numerous additional policy violations by Defendants Does 1-6 going unpunished with regard to the events surrounding the shooting of Gelhaye.

85. The supervisory Defendants were causally and directly involved in the violation of Gelhaye's constitutional rights.

86. As a result of the department-wide reporting and cover-up methods, Gelhaye has been unable to identify the shooter – Defendant Doe 1 – by name.

87. Further, upon belief, multiple officers in the area of Gelhaye's shooting were equipped with body-worn cameras (BWCs).

88.  MPD policies required that the officers at the scene have their BWCs in recording mode because the following applied to the subject incident: in-person contact by officers, use of force by officers, use of deadly force by officer and the situation amounted to a critical incident as defined by MPD policy. See Policy 4-223.

89. In the event that the BWCs were not in recording mode prior to the shooting of Gelhaye, they were required to be "activated as soon as it [was] safe to do so" under Policy 4-223(5)(6)(a)(vii).

90. The digital audio-video evidence that the BWCs were to have collected from the scene was to be uploaded at the conclusion of the officers' shifts with the proper classification that linked it to the proper incident under Policy 4-223(8)(a)-(d).

91. Fail safes in the MPD BWC policy also would ensure that some information regarding the event was reported in case all of the officers at the scene of Defendant Doe 1's shooting of Gelhaye had failed to put their BWCs in recording mode. See Policy 4-223(6)(d). 116. However, rank-and-file MPD officers have felt free to violate MPD's policies with regard to BWC usage, which dovetails with the department-wide cover-up methods described above.

92. The supervisory Defendants and policymakers at the MPD and the City of Minneapolis had actual knowledge of policy violations among officers with regard to the BWCs or were deliberately indifferent to the need for proper use or reporting of the failure to activate the BWCs by turning a blind eye. To date, despite her efforts, Gelhaye has been unable to obtain any BWC footage of the incident from the MPD or the City – either none exists or the City or MPD is withholding it.

93. Neither the shooter nor the other involved officers have been identified.

94. The lack of consequences imposed upon MPD officers who protect their own or who, in violation of their sworn duties as peace officers, fail to cooperate with investigations into such matters ensures that the Blue Wall of Silence remains intact.

95. MPD Policy 5-101.01 provides that:

The integrity of police service is based on truthfulness. Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her official duty as a Minneapolis Police Officer. MPD employees shall not willfully or knowingly make an untruthful statement or knowingly omit pertinent information in the presence of any supervisor, intended for the information of any supervisor or before any court or hearing. Officers shall not make any false

statements to justify a criminal or traffic charge or seek to unlawfully influence the outcome of any investigation. These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business. MPD employees are obligated under this policy to respond fully and truthfully to questions about any action taken that relates to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business.

96. The MPD's continued failure to discipline officers, through policymakers Defendants Does 7-8 and Chief Arradondo, causes MPD officers to act with impunity and without due regard for the Constitution and laws of the United States. The consequences of this are becoming all the more apparent and pervasive.

**GELHAYE'S INJURIES**

97. Gelhaye sustained devastating and permanent disfiguring physical injuries as a result of being shot.

98. The following is a picture of Gelhaye's injuries taken soon after she was shot:



99. Among other things, Gelhaye sustained facial and ocular trauma. She treated for these injuries at the following medical providers: Abbott Northwestern Emergency Department, West Metro Ophthalmology, VitreoRetinal Surgery, and Fairview Southdale Hospital Emergency Department.

100.      Angelo P. Tanna, M.D., Professor and Vice Chairman, Department of Ophthalmology, Director, Glaucoma Service, Northwestern University Feinberg School of Medicine, reviewed Gelhaye's medical records pertaining to her eye and face injuries.

101.     Dr. Tanna, has confirmed, based on the content of the medical records, that

Gelhaye sustained permanent injuries. He believes Gelhaye will require future medical

care to treat her injuries which will result in significant costs.

102.     Dr. Tanna has stated the following regarding Gelhaye's eye injury:

**Based on the history and clinical documentation in the medical records from multiple providers, it is clear within a reasonable degree of medical certainty that all of the care Ms. Gelhaye received was necessary and reasonable and the traumatic injury of 5/27/20 cased all of the conditions below.**

1. The patient's **facial laceration** crossed Langer's lines, and would therefore be expected to heal with a significant scar.

2. **Trauma to the iris** (iridodialysis, traumatic mydriasis, posterior synechiae). This causes an abnormal appearance of the iris that can be seen by observers during casual observation. In my experience, patients can be troubled by the abnormal cosmetic appearance. Surgical repair is possible but is complicated and associated with risks of infection, hemorrhage, glaucoma, and total loss of vision. Surgical repair can improve the cosmetic appearance but cannot normalize it. The patient's pupil will remain non-reactive as well. A condition that is permanent and commonly results in glare and light sensitivity.

3. The severity of the trauma to the patient's iris as well as the history of very severe intraocular pressure elevation that occurred on 6/8/20, indicate that the patient is at a life-long **increased risk of developing glaucoma**. Traumatic glaucoma is more difficult to manage than more common forms of glaucoma and is associated with the risk of total vision loss (loss of the ability to perceive light) in the affected eye. Notably, since the patient has asthma, a category of medications, beta-blockers, should be avoided due to the risk of asthma exacerbation. This further increases the patient's risk for requiring major incisional surgery to control glaucoma should it develop. The patient should be evaluated by a glaucoma specialist or a comprehensive ophthalmologist with expertise in glaucoma to perform certain baseline testing to facilitate the ability to detect glaucoma in a timely fashion, should it develop in the future. This testing includes gonioscopy, measurement of the central corneal thickness with ultrasonic pachymetry, OCT of the retinal nerve fiber layer and ganglion cell complex and optic disc photography. She should be closely monitored for the development of glaucoma for the next 2 years, with ophthalmology examinations every 2 to 3 months for the next year and every 4 months the year after. If her intraocular pressure and optic nerve remain normal, she can be monitored twice per year thereafter.

4. **Vitreous hemorrhage** of the right eye will slowly resolve completely.

5. Traumatic retinal dialysis of the right eye has begun to scar; however, there is an **increased risk of retinal detachment**. Ross reported, in a landmark article, that retinal detachment in the setting of a retinal dialysis can occur years after trauma.[1] The patient should be monitored by a retinal specialist every 4 to 5 months for the next 2 years., after which she should be seen every year by a retina specialist. If a retinal detachment occurs in the future, major surgery would be required to repair it.

6. **Retinal damage with permanent vision loss**. Blunt trauma can damage the outer retinal tissue (commotio retinae or Berlin's edema), as occurred in Ms. Gelhaye. Over time, the appearance of commotio retinae on clinical examination resolves. Depending on the severity of the damage, however, there can be resolution of the underlying damage to the retinal photoreceptors or varying degrees of residual damage with permanent vision loss. In this case, based on the persistent vision loss nearly 10 months after the occurrence of trauma, and due to loss of the ellipsoid detected on optical coherence tomography, there will be no further improvement. [2]

7. Epiretinal membrane of the right macula. Trauma is known to be associated with the development of epiretinal membranes. This is a fibrotic membrane on the surface of the central retina. These membranes cause wrinkling of the retinal tissue which can lead to distortion of the vision and can also lead to macular edema. Because of Ms. Gelhaye's central vision loss, it is unlikely the problem will lead to further vision loss because her vision loss from traumatic injury to the retina (described in item 6 above) limits her visual potential in the right eye.

8. **Traumatic cataract**. Based on the clinical description, Ms. Gelhaye has a cataract that tends to cause glare. It is likely she will require cataract surgery in the future and that it will be needed much earlier than typically needed for age-related cataract. Cataract after trauma can be difficult to manage and is associated with an increased risk of complications that can be vision-threatening such as retinal detachment. [3]

103.   Moreover, David B. Lund, PsyD (Licensed Psychologist) reviewed Gelhaye's

counseling records from St. Thomas University Counseling and Psychological Services.

---

[1] Ross  WH. Traumatic Retinal Dialyses. Arch Ophthalmol. 1981;99(8);1371-1374.  doi: 10.1001/archopht.1981.03930020245005

[2] Ahn SJ, Woo SJ, Kim KE, Jo DH, Ahn J, Park KH. Optical coherence tomography morphologic grading of macular commotio retinae and its association with anatomic and visual outcomes. Am J Ophthalmol, 2013 Nov;156(5):994-1001.e1.doi: 10.1016/j.ajo.2013.06.023. Epub 2013 Aug 20. PMID: 23972302.

[3] Kuhn F. Traumatic cataract: what, when, how. Graefes Arch Cin Exp Ophthalmol. 2010 Sep;1221-3. Doi: 10.1007/s00417-010-1387-9. Epub 2010 Apr 29. PMID: 20428883

104.     After reviewing these records, Dr. Lund has concluded that Gelhaye sustained a

psychological injury, post traumatic stress disorder, and that these injuries are permanent.

In his report dated February 7, 2021, Dr. Lund writes the following: "This individual has

suffered an emotionally traumatic event and even now continues to experience high

levels of physical reactivity, stress, and classic symptoms of intrusive symptoms with

avoidance behavior." Dr. Lund opines this was caused by the 05/27/2020 event wherein

Gelhaye was shot in the face.

105.     Gelhaye's extensive treatment continues and will be needed in the future. Gelhaye

has and will continue to incur significant medical bills.

106.     The following are photos of Gelhaye taken during her course of treatment:







107.     To this day, Gelhaye continues to experience the following symptoms in her right eye:

- blindness in center of vision;

- obscured/blurred peripheral vision;

- "floaters" in vision that distract, obscure peripheral vision, and make reading (paper and digital) difficult;

- fluctuations in eye pressure that cause pain in eye and surrounding area;

- cataract from impact that obscures peripheral vision;

- light sensitivity, especially in area of exposed lens near cataract;

- nerve damage resulting in pain (dull & aching or sharp) in eye.

108.     To this day, Gelhaye also continues to experience daily migraines and headaches, altered death perception, depression and anxiety nightmares as result of the May 27, 2020 incident.

### COUNT I
### 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant John Doe 1*

109.     Gelhaye realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

110.     By the actions described above, Defendant John Doe 1, under color of state law, violated and deprived Gelhaye of her clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

111.     Defendant John Doe 1 subjected Gelhaye to these deprivations of her rights either maliciously or by acting with reckless disregard for whether her rights would be violated.

112.    As a direct and proximate result of the acts and omissions of Defendant John Doe 1, Gelhaye suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $2,000,000.

113.    Punitive damages in an amount exceeding $2,000,000 are available against Defendant John Doe 1 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20. 157. Gelhaye is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### *COUNT II*
### 42 U.S.C. § 1983 – FIRST AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendants John Does 1-6*

114.    Gelhaye realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

115.    Gelhaye engaged in constitutionally protected acts of speech and assembly in the form of peaceful protesting in Minneapolis. She did so in a public place and at all times obeyed the requests by City leaders.

116.    Defendants John Does 1-6, under color of state law, retaliated against Gelhaye for engaging in said constitutionally protected activity.

117.    Gelhaye's First and Fourteenth Amendment rights were violated when she was deliberately targeted and shot during the course of the protest, and in the cover-up perpetrated by Defendants John Does 1-6 afterward.

118.    The conduct of Defendants John Does 1-6 tends to chill citizens from continuing to engage in constitutionally protected activity.

119.     Defendants John Does 1-6 subjected Gelhaye to these deprivations of her rights either maliciously or by acting with reckless disregard for whether her rights would be violated.

120.     As a direct and proximate result of the aforementioned unconstitutional conduct, Gelhaye has been damaged in an amount exceeding $2,000,000.

121.     Punitive damages in an amount exceeding $2,000,000 are available against Defendants John Does 1-6 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20. 166. Gelhaye is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### *COUNT III*
**42 U.S.C. § 1983 – CONSPIRACY TO INTERFERE WITH THE ASSERTION OF GELHAYE'S RIGHTS UNDER THE CONSTITUTION AND 42 U.S.C. § 1983**
***Plaintiff v. Defendants John Does 1-6***

122.      Gelhaye realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

123.     Defendants John Does 1-6 agreed either to improperly report, or not report at all, the incident regarding Gelhaye.

124.     Defendants John Does 1-6 improperly reported, or did not report at all, the incident regarding Gelhaye.

125.     Defendants John Does 1-6 did so in concert and with the intent to shield Defendant John Doe 1 and thereby prevent the assertion of Gelhaye's civil rights. Defendants John Does 1-6, under color of state law, committed the above misconduct maliciously or with reckless disregard for whether Gelhaye's rights would be violated.

126.     As a direct and proximate result of the actions described above, which are tantamount to obstruction of justice, Defendants John Does 1-6 have conspired to interfere with and interfered with the assertion of Gelhaye's civil rights, and Gelhaye was thereby damaged in an amount exceeding $2,000,000.

127.     Punitive damages in an amount exceeding $2,000,000 are available against Defendants John Does 1-6 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

128.     Gelhaye is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### COUNT IV
### SUPERVISORY LIABILITY
### *Plaintiff v. Defendants John Does 7-8 and Medaria Arradondo,*
### *in their individual capacities*

129.     Gelhaye realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

130.     Defendants John Does 7-8 and Medaria Arradondo at all times material hereto were members of the Minneapolis Police Department with supervisory responsibilities over Defendants John Does 1-6.

131.     These supervisory Defendants at the City of Minneapolis had actual knowledge of the constitutionally infirm force reporting in widespread use among officers.

132.     As such, rank and file, such as Defendants John Does 1-6 with regard to Gelhaye, freely and fragrantly violate citizens' constitutional rights using department-wide reporting methods to cover it up.

133.     The supervisory Defendants had actual knowledge of the improper reporting by Defendants John Does 1-6 regarding the Gelhaye incident and other similar incidents, further evidencing a policy or custom of constitutional misconduct.

134.     These supervisory Defendants, under color of state law, acted with deliberate indifference to, authorized or acquiesced in the violation of Gelhaye's constitutional rights by Defendants John Does 1-6.

135.     As a direct and proximate result of the acts and omissions of Defendants John Does 7-8 and Medaria Arradondo, Gelhaye suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $2,000,000.

136.     Punitive damages in an amount exceeding $2,000,000 are available against Defendants John Does 7-8 and Medaria Arradondo and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20. 183. Gelhaye is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### *COUNT V*
### CIVIL RIGHTS VIOLATIONS MONELL V. DEP'T OF SOCIAL SERVICES
### *Plaintiff v. Defendants City of Minneapolis, Arradondo and Does 7-8,*
### *in their official capacities*

137.     Gelhaye realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

138.     Before May 27, 2020, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers, including the Defendants herein, of the improper use of force, including deadly force.

139.　　　Through policymakers Defendants John Does 7-8 and Chief Arradondo, and with the department's ratification and approval, by failing to discipline all officers consistently on this point, there has been an approval of a deficient policy, custom, or practice of the improper use of force, including deadly force.

140.　　　Gelhaye's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices and the City of Minneapolis is thereby liable in an amount exceeding $2,000,000.

141.　　　Gelhaye is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gelhaye prays for judgment as follows:

1. That this Court find that the Defendants committed acts and omissions violating the First, Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2. As to Count I, a money judgment against Defendant John Doe 1 for compensatory damages and punitive damages in an amount in excess of $4,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3. As to Count II, a money judgment against Defendants John Does 1 through 6 for compensatory damages and punitive damages in an amount in excess of $4,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4. As to Count III, a money judgment against Defendants John Does 1 through 6 for compensatory damages and punitive damages in an amount in excess of $4,000,000, together

with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5. As to Count IV, a money judgment against Defendants John Does 7 and 8 and MPD Chief Medaria Arradondo for compensatory damages and punitive damages in an amount in excess of $4,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

6. As to Count V, a money judgment against the City of Minneapolis for compensatory damages in an amount in excess of $2,000,000, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

7. For an order mandating changes in the policies and procedures of the Minneapolis Police Department requiring, among other things, policy and training measures in the proper use of "non-lethal weapons," the proper reporting of use of force, adherence to policies to ensure the identities of officer-shooters and witnesses are not shielded from victims, and relations and policing with those exercising their First Amendment rights; and

8. For such other and further relief as this Court may deem just and equitable.


Dated: July 8, 2021                         MAGNA LAW FIRM LLC


                                            /s/ Oliver E. Nelson III
                                            Oliver Edward Nelson III, No. 0347280
                                            2915 South Wayzata Boulevard
                                            Minneapolis, MN 55405
                                            onelson@magnalaw.net
                                            (763) 234-4433

                                            *Attorney for Plaintiff*